IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

D'ANNA FUOCO                          :               CIVIL ACTION
                                      :
        v.                            :
                                      :
LEHIGH UNIVERSITY                     :               NO. 11-CV-6117

### MEMORANDUM

Ditter, J.                                            November 8, 2013

 Plaintiff, D'Anna Fuoco, has filed this employment discrimination action against her

former employer, Lehigh University.  Fuoco contends that she was subject to discrimination on

the basis of her disabilities – namely, depression and attention deficit disorder ("ADD") – in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*[1]  By order dated September

30, 2013, I granted defendant's motion for summary judgment.  This memorandum sets forth the

rationale for that decision.

### I. FACTUAL BACKGROUND[2]

 D'Anna Fuoco was hired by Lehigh in September 1997, as an office manager in the

Department of Transition and Assessment Services.  In 2002, she applied for and accepted a

secretary position in the Office of Admissions and remained in that role until January 2008,

---

[1] In her complaint and amended complaint, Fuoco alleges that she "suffers from stress and memory lapses." *See Am. Compl.* ¶ 36.  She mentions no other disorder or medical condition.  However, in Fuoco's response to Lehigh's motion for summary judgment, she clearly states that she "suffers from Attention Deficit Disorder and Depression" and does not argue that any other condition qualifies as a disability under the statute.  *See Pl.'s Br.* at 3. I will therefore consider only ADD and depression with respect to Fuoco's claims.
 Fuoco also alleged in her complaint violations of the Age Discrimination in Employment Act and related state law, but she later voluntarily withdrew her age discrimination claims.

[2] Where the facts are agreed, I have not cited to the record.

when she began working as a coordinator in Lehigh's Office of Multicultural Affairs.  Fuoco's employment with Lehigh was terminated on September 23, 2010.

Fuoco's history of medical issues, including alleged physical and mental impairments, as well as her relevant work-performance record, are described below.

### A.  Department of Transition and Assessment Services

Fuoco concedes that from 1997 to 2002, while working in the Department of Transition and Assessment Services, she never notified any of her supervisors of any disabilities or impairments.  *Pl.'s Response to Def.'s Statement of Undisputed Facts ("Pl.'s Facts")* ¶ 4.  The record does not reflect that Fuoco was diagnosed with any impairment during this time, and Fuoco does not contend that any alleged disability impacted her daily life, including her work performance.  *See Fuoco Dep.* at 20 (testifying she was not aware of her disabilities during this time); *id.* at 17-18 (noting that her performance appraisals were average).

### B.  Office of Admissions

While Fuoco was employed in the Office of Admissions, from 2002 to 2007, she was supervised by Lisa Dubreuil and Bruce Bunnick.  Fuoco's work performance was satisfactory until late-2005.  Around September 2005, Fuoco was assigned additional responsibilities because another employee in the department was terminated.  Overwhelmed by the added duties, Fuoco asked Dubreuil if she could be relieved from answering the phones because it distracted her from her other work.  *See Fuoco Dep.* at 27-28.  Dubreuil denied her request.

A month later, on October 29, 2005, Fuoco and Dubreuil met and Fuoco was reprimanded for poor work performance.  During this meeting, Dubreuil discussed with Fuoco the various problems observed with her work, focusing on areas related to communication, organization, and follow through, as well as attention to detail.  *See Def.'s Br.*, Exh. C.  Dubreuil

determined that she and Fuoco would meet on a weekly basis to monitor Fuoco's progress and Fuoco was warned that if she did not improve, she would receive a formal warning.  *Id.*

Thereafter, prior to Christmas 2005, Fuoco received a poor performance evaluation and was placed on probation.  It is unclear exactly how long this probation period lasted or what took place between Fuoco and her supervisors, but presumably she completed the necessary probationary period.  There is nothing else in the record related to Fuoco's work performance leading up to her departure from the Office of Admissions at the end of 2007.

In explaining what led to the above-mentioned disciplinary issues and work-related problems, Fuoco testified that in late 2005 she was experiencing significant stress at home as she was caring for her daughter who nearly died from an overdose, as well as the added stress at work caused by her new duties.  *Fuoco Dep.* at 30-31.  In early 2006, Fuoco took a four month leave of absence, either under the Family and Medical Leave Act ("FMLA") or short-term disability, in order to care for her daughter.  *Id.* at 36.  Fuoco testified that despite taking the leave to care for her daughter, she "might have lied" to Lehigh as to the reason and recalled submitting a physician's certificate wherein the doctor "wrote [her] an excuse to take time off" and believed that the doctor said she was depressed.  *Id.* at 36-37.  Fuoco took the leave without any difficulty from Lehigh.  *Id.* at 37.

Fuoco also submitted as part of the record a letter addressed to her then-supervisor, Dubreuil, copying Eric Kaplan in Human Resources, dated May 13, 2005, apologizing for "the position I put you and my coworkers in due to my absences over the past six months."  *Pl.'s Br.*, Doc. 23-7.[3]  In the letter, Fuoco explained that she had experienced a nervous breakdown earlier in the year and had missed work due to "health and personal problems," noting that she was

---

[3] As plaintiff did not itemize her exhibits, I will refer to them by their docket numbers and/or Bates numbers, whichever is available and provides the clearest reference.

seeking medical help to get her "life back on track." *Id.* Fuoco further stated, "[d]epression and anxiety are hard things for people to understand if they never experienced them" and that she had "been very open about my situation to try and ease the tension between myself and my coworkers." *Id.*

At her deposition, Fuoco stated that during this time she was unaware of any underlying learning disability, such as ADD, or any stress disorder. *Fuoco Dep.* at 32. Indeed, Fuoco acknowledged that she thought any problems she was experiencing were due to her alcohol and drug addiction. *Id.* Other than the May 13, 2005 letter addressed to Dubreuil, Fuoco did not testify that she informed her supervisors of any other mental impairment she was experiencing.

Fuoco also testified about having filled out FMLA paperwork at some point and listing alcoholism and depression as the reason for her potential leave. This paperwork was not provided as part of the record, but Fuoco thought she completed it after returning from the leave to care for her daughter in 2006. *Id.* at 38, 53. It is clear that Fuoco never actually took this particular FMLA leave. *Pl.'s Facts* ¶ 21 ("[Plaintiff] believed having the paperwork in place would protect her. Yet, Plaintiff never ended up taking FMLA leave."). Fuoco explained that she filled out the paperwork just in case she needed it and thought she submitted it to Human Resources and might have explained her situation to Peter Hinkle, a Human Resources associate. *Fuoco Dep.* at 53. Fuoco also believed that, along with the FMLA paperwork, she might have submitted a written diagnosis from her physician, Dr. Eric Becker, who had just recently diagnosed her with depression. *Id.* at 53-56. Fuoco saw Dr. Becker for treatment during the early part of 2006 while she was out caring for her daughter, and was prescribed a "general antidepressant." *Id.* at 59.

Fuoco also believed that she started seeing a physician during this time period for the treatment of migraine headaches. *Id.* at 64-65. She testified that all of her co-workers, as well as several of her supervisors, were aware she experienced migraines. *Id.* at 77. Finally, around October 2007, Fuoco was involved in a car accident and was injured. While she did not receive surgery for these injuries until 2009, she testified that she thinks she may have taken a couple of days or a week medical leave around the time of the accident. *Id.* at 46-47.

### C.  Office of Multicultural Affairs

Fuoco began working in the Office of Multicultural Affairs as a coordinator on January 3, 2008. Her job responsibilities included coordinating events and meetings, maintaining the office calendar, including that of her supervisor, and making arrangements for various student activities. *Def.'s Statement of Undisputed Facts ("Def.'s Facts")* ¶ 16; *Fuoco Dep.* at 133. Fuoco was supervised initially by John McKnight and later by Jame'l Hodges. *Def.'s Facts* ¶ 17-18. Alison Gelati was Hodges's supervisor.

Fuoco's employment during 2008 appears to have been without incident. Fuoco's first full-year appraisal was satisfactory, but her then-supervisor noted concerns due to her absenteeism. Fuoco explained that this absenteeism was due to having doctors' appointments and physical therapy stemming from her earlier car accident, as well as her other physical ailments including a heart murmur and migraine headaches. *Fuoco Dep.* at 71-74. According to Lehigh, Fuoco's next performance appraisal, for the year ending December 31, 2009, reflected a rating of "needs improvement" and contained comments from her then-supervisor, Hodges, as to excessive absences and "balancing personal and work related issues." *Zavalydriga Aff.* ¶ 16.

In April 2009, Fuoco underwent surgery to alleviate the pain she was experiencing from a crushed or herniated disc that was a result of the 2007 car accident. *Fuoco Dep.* at 71-72; *Pl.'s*

*Br.*, Doc. 23-8.  Fuoco took leave for this surgery and subsequent recovery, although it is unclear whether that leave was under FMLA, short-term disability, vacation, or a combination thereof. *See Pl.'s Br.*, Doc. 23-8 (Fuoco's short-term disability paperwork); LU 000275; Doc. 23-9 (April 1, 2009 letter from Human Resources notifying Fuoco that her current leave was being designated as FMLA leave).[4]  In any event, Fuoco returned to work part-time in July 2009 and then later returned to work full-time around August 2009.  *See id.*, Doc. 23-14, LU 000255; Doc. 23-17, LU 000292.[5]  Fuoco acknowledges that Lehigh accommodated her medical needs by allowing her to take time to recover from her surgery.  *Fuoco Dep.* at 71-72 (testifying that she "took as much time as [she] needed to commit to [her] physical therapy and doctors' appointments, all of which had to be made during the day").

Moreover, the record reflects that throughout the remainder of 2009 and the first half of 2010, Fuoco was never denied the opportunity to take time off or miss work for any appointments.  In fact, the opposite is true as Lehigh permitted Fuoco to often miss work due to her own and her family's medical needs.  *See, e.g.*, *Pl.'s Br.*, LU 000256 (August 26, 2009 return to work doctor's note due to "illness"); LU 000259 (September 11, 2009 doctor's note from an ob/gyn providing an excuse from work); LU 000273 (November 24, 2009 email from Fuoco to Hodges regarding her making a "last minute" doctor's appointment over her lunch hour); LU 000263 (January 11, 2010 email from Fuoco to Hodges concerning her eye problems and need to see an ophthalmologist); LU 000268 (March 24, 2010 email to Hodges regarding a dentist appointment); LU 000266-267 (April and May 2010 emails to Hodges that she will be taking

---

[4] While this letter does not include dates for the "current leave" referred to or the reason for the leave, the timing corresponds with Fuoco's leave for her back surgery and Fuoco does not explain for what other reason she would have taken FMLA leave at that time.

[5] Similarly, these emails and other documents appear to be related to the leave for her back surgery – as they do not refer to any other illness or medical issue and Fuoco has not indicated that they put her supervisors on notice of any other problem.  Moreover, a treatment plan submitted (Doc. 23-17) and signed by her physician indicates a surgery date of April 27, 2009, and return to work date of July 6, 2009.

time off to care for her son after his oral surgery); LU 000258, LU000265 (July 2010 internal email informing recipients that Fuoco was not coming to work due to a migraine and her plan to see a doctor, and corresponding emergency room form providing an excuse from work on that day). Indeed, Fuoco's attorney acknowledged during oral argument that there was nothing Fuoco ever requested that was denied by Lehigh.

In addition to her excessive absences, in the summer of 2010, Fuoco's work performance deteriorated, and eventually she was terminated on September 23, 2010. More specifically, in August 2010, Lehigh contends, and Fuoco agrees, the Office of Multicultural Affairs had scheduled a trip for students to Dorney Park, a local amusement park, as part of its "Preclusion Program," which was an orientation program for new students. *See Fuoco Dep.* at 122. Fuoco was tasked with reserving the admission tickets ahead of time, something she admits she failed to do, resulting in the school's having to pay more for the tickets at the gate. *See id.* at 122-125. Additionally, on September 10, 2010, Fuoco and Hodges did not arrive for a mandatory breakfast meeting because Fuoco failed to add it to either of their calendars. *Id.* at 133 (admitting she was responsible for keeping Hodge's calendar). Although Fuoco was later directed to attend the meeting, she failed to do so. *Zavalydriga Aff.* ¶ 20.

As a result of these incidents, Fuoco was placed on a Performance Improvement Plan ("PIP") on September 13, 2010. However, the same week she was placed on the PIP, Fuoco made additional mistakes, including listing the wrong month for an event on the department's Facebook page and not purchasing CDs as directed for an orientation program. *See Zavalydriga Aff.* ¶ 22-23. Then, on September 22, Fuoco failed to order food or decorations for the office's Hispanic Heritage Days event – another error she acknowledges that she committed. *Fuoco Dep.* at 145 (admitting she did not order the food); *Zavalydriga Aff.* ¶ 25. Fuoco was out of the office

on vacation that day and failed to make the necessary arrangements beforehand.  *Fuoco Dep.* at 145.[6]  Lehigh describes Heritage Days as one of the department's most important events, and considered her errors significant.  *See Def.'s Facts* ¶ 37-38; *Zavalydriga Aff.* ¶ 25.

As a result, during a meeting on September 22, 2010, several people, including Fuoco's supervisors, the Dean of Students, the Vice Provost for Student Affairs, and an assistant general counsel, met and made the decision to terminate Fuoco the following day, when she was scheduled to work.  *Zavalydriga Aff.* ¶ 26.  The reason cited by Lehigh was that "the University had lost confidence in her ability to effectively perform the duties of her position."  *Id.* ¶ 12.

On the morning of September 23, Fuoco called and left a voicemail for Hodges notifying him that she was concerned for her well-being and would not be coming into work.  Fuoco testified that she also said in her message that she was "going to call my doctor and make an appointment to be seen immediately, possibly even go to the hospital."  *Fuoco Dep.* at 158-59.  Then later that day, Lehigh notified Fuoco, through her boyfriend,[7] that she was being terminated.  *Id.* at 159; *Zavalydriga Aff.* ¶ 29.

Fuoco started to realize around the month before her termination (i.e. August/September 2010) that something was wrong, but she did not know if it was her "disability or menopause."  *Fuoco Dep.* at 49.  She explained that after she forgot to put the staff meeting on Hodge's calendar, Fuoco spoke with both Hodges and Gelati and expressed her concern that something was wrong with her.  Fuoco stated that to Gelati she said she "might have a medical condition going on" and that she was not sure "what is going on . . . whether it's [her] age or a disability [she's] having."  *Id.* at 93-95.  Asked what possible reasons she would have given, she said

---

[6] According to one of Fuoco's time sheets submitted as part of the record, September 20, 2010, was a Monday and Fuoco was present at work.  *See Pl.'s Br.*, Doc. 23-12, LU 000246.  Tuesday and Wednesday, September 21 and 22, Fuoco took vacation, and Thursday, September 23, was designated as "sick leave/excused absence."

[7] Fuoco had no cell or home phone.  *Fuoco Dep.* at 158-59.

"menopause, my age, and ADHD and I don't think I said anything about my alcoholism." *Id.* at 96. Fuoco also alleges that she told Gelati that while she was not sure exactly what was wrong with her, she was "going to try and find out what it is so that I can be accountable in this position." *Id.* at 93-95.

Fuoco testified that she spoke with Hodges after the Dorney Park mishap and "told him about the possibilities of what is going on" and that she was going to get tested. *Id.* at 125.[8] Fuoco further explained, "I think I told him about my concerns, about the possibility of my disability, menopause, get tested and find out what is going on with me." *Id.* at 130. Fuoco stated that she then followed up with Hodges after making some appointments in order to keep him informed. *Id.* at 131-33.

When asked who initially diagnosed her with ADD, Fuoco was unsure whether it was Dr. Abel Gonzalez or her neurologist, Dr. Gould. *Id.* at 64. Asked when she was specifically diagnosed with ADD, Fuoco explained, "during the time I was terminated because I had the tests approximately a month prior to my termination because of my concern . . . I don't think [Dr. Gould] actually came back with a diagnosis until after I was terminated." *Id.* at 65-66. The record does not include any reports from either physician.

After her termination, in early October 2010, Fuoco emailed human resources to inform them that she was taking medical leave, and sent a doctor's note as an excuse for not coming to work from September 23 through October 5.

---

[8] Fuoco testified she told Hodges that she was going to have a "mind stream test and a sleep study test." *Fuoco Dep.* at 130. Fuoco does not explain, however, what the tests have to do with ADD, whether she actually had those tests, what the results were, or whether she ever told anyone at Lehigh about the results.

Eighteen months later, in April 2012,[9] Fuoco saw Dr. Daniel Medlar, a licensed psychologist, who completed an interview and administered several tests as part of a "neuropsychological evaluation in order to assist with vocational/educational decision-making and planning." *Def.'s Br.*, Exh. F.  According to Dr. Medlar's report, based on Fuoco's "reported history, diagnostic interview, and assessment results," Fuoco then met the Office of Vocational Rehabilitation ("OVR") criteria for ADHD, predominately inattentive type. *Id.*  In addition to meeting the ADHD criteria, the report indicated "adjustment disorder with anxiety,"[10] "depressive disorder not otherwise specified," and "learning disorder not otherwise specified," as well as various alcohol and controlled substance dependences "sustained full remission." *Id.*

## II.  <u>STANDARD OF REVIEW</u>

The standard for summary judgment is well established.  I must consider the evidence in the light most favorable to the non-moving party.  If there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

However, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions to defeat a summary judgment motion.  Here, Fuoco must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  She "must

---

[9] According to Fuoco's facts, Dr. Gould's test was administered in August 2011 and showed that she suffered from cognitive disorders.  *Pl.'s Facts* ¶ 45.  This unsupported assertion is ultimately irrelevant as either date, April 2012 or August 2011, follows her termination.

[10] In her fact response, Fuoco disputes the date of her diagnosis with stress-related anxiety, stating that it was 2006, despite testifying at her deposition that it was in 2012 as diagnosed by Dr. Medlar.  *See Fuoco Dep.* at 58.  This factual dispute is again not relevant as "stress-related anxiety" is not one of her claimed disabilities.  Although "stress" was raised in Fuoco's complaint, neither stress nor stress-related anxiety is asserted as the basis for Fuoco's disability in her response to Lehigh's motion for summary judgment.

present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).  She cannot "merely rely upon conclusory allegations in her pleadings or in memoranda and briefs." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

## III.   DISCUSSION[11]

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).[12]  A "qualified individual with a disability" is a person who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Id.* § 12111(8).  Thus, to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show: "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (internal citations and quotations omitted).

---

[11] In addition to seeking summary judgment on Fuoco's ADA claim on the basis that there is no genuine dispute as to any material fact, Lehigh argues in its brief that it is entitled to summary judgment because Fuoco failed to make proper service pursuant to Federal Rule of Civil Procedure 4(c), or alternatively, because Fuoco failed to exhaust her administrative remedies. The former of these procedural arguments was already disposed of by Judge Stengel's March 27, 2012 order denying Lehigh's motion to dismiss as moot. *See* Dkt. 7. As to the issue of exhaustion of administrative remedies, Lehigh contends that dismissal is appropriate where, as here, a plaintiff files suit in federal court without first receiving a Notice of Right to Sue letter from the EEOC. It is true that Fuoco filed her lawsuit on September 28, 2011, but did not receive a Right to Sue letter until October 5, 2012 from the EEOC and April 6, 2012 from the PHRC. Nevertheless, as several courts in this district have recognized, "EEOC administrative remedies may be considered fulfilled when a right-to-sue letter is issued before trial." *See Atkinson v. Lafayette Coll.*, No. 01-CV-2141, 2002 WL 123449, at *2 (E.D. Pa. Jan. 29, 2002) (citing cases); *Lantz v. Hosp. of the Univ. of Pennsylvania*, No. 96–2671, 1996 WL 442795, at *2 (E.D. Pa. July 30, 1996) (citing *Molthan v. Temple Univ.*, 778 F.2d 955, 960 (3d Cir.1985)). Moreover, the record shows that Fuoco's counsel attempted to obtain a letter from the EEOC prior to filing this lawsuit. *See Pl.'s Br.*, Doc. 23-11.

[12] The elements of a PHRA claim will not be discussed separately as disposition of the ADA claim applies equally to the state law claim. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 935 n.1 (3d Cir. 1997).

Discrimination under the ADA encompasses not only employers' adverse actions against employees that are "motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for [an employee's] disabilities." *Id.*  In other words, an employer can unlawfully "discriminate" within the meaning of the ADA in two different ways that are relevant to the present case: (1) if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability or the employer's belief that the individual had a disability (i.e. disparate treatment); or (2) if the employer fails to make reasonable accommodations for that individual.  The ADA specifically states that an employer discriminates when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).

Before considering whether Lehigh discriminated against Fuoco, I will first examine whether Fuoco has established that she was disabled within the meaning of the ADA – in other words, that she is a member of the protected class that the ADA intended to cover.

### A.  <u>Disability</u>

The ADA defines "disability" in three ways:  (1) a physical or mental impairment that substantially limits one or more major life activities of the individual; (2) a record of such impairment; or (3) being regarded as having such an impairment.  42 U.S.C. § 12102(1)(A)-(C). In her response to the motion for summary judgment, Fuoco contended that she satisfies the ADA's disability requirement because she suffered from an actual disability – ADD and

12

depression – that substantially limits a major life activity, or in the alternative, she was "regarded as having" an impairment.  *Pl.'s Br.* at 3, 15.

### 1. Actual Disability

To establish that she suffered from an actual disability, Fuoco must point to evidence that she suffered from a physical or mental impairment and that the impairment *substantially limited* one of her "major life activities."   "Major life activities" include such things as, caring for oneself, walking, breathing, and more relevant in this case, learning, concentrating, thinking, communicating, and working.  *See* 42 U.S.C. § 12102(2)(A).  While the terms of the ADA are interpreted broadly, the determination of whether a plaintiff's impairment "substantially limits" a major life activity will require an individualized assessment that compares the person's ability to perform the activity as compared to most people in the general population.  *See id.* § 12102(4)(A); 29 C.F.R. § 1630.2(j).  This analysis will consider several factors, including the nature of the impairment, the condition and manner in which the individual performs the major life activity, and the duration of time it takes the person to perform the major life activity.  *See* 29 C.F.R. § 1630.2(j)(3)-(4).  Finally, the "substantially limits" assessment will not consider the ameliorative effects of mitigating measures (i.e. medications or reasonable accommodations).  42 U.S.C. § 12102(4)(E).

Although characterized by uncertain and contradictory assertions, Fuoco's evidence read fairly shows that she was suffering from a variety of physical and mental impairments for many years.  During her employment with Lehigh, she believed and told others that her problems were the result of alcohol and drug addictions and menopause.

While Fuoco provides evidence and testimony concerning an array of ailments – she long suffered from migraine headaches (*Fuoco Dep.* at 64-65, 76-77), has endured a lengthy battle

13

with drug and alcohol addiction (*id.* at 13, 46, 64, 68, 79), was involved in a car accident resulting in back injury that eventually required surgery (*id.* at 71-72), and had a host of other problems, including a heart murmur (*id.* at 74), severe anemia (*id.* at 106-107), memory loss (*id.* at 106), stress-related anxiety (*id.* at 51, 58), and menopause (*id.* at 172) – in her response to Lehigh's motion for summary judgment, the only impairments that Fuoco mentions qualify as disabilities under the statute are depression and ADD, also at times referred to by Fuoco and Dr. Medlar, as attention deficit hyperactivity disorder ("ADHD") . *Pl.'s Br.* at 3.

It is undisputed that depression and ADD are mental impairments covered under the ADA. *See* 29 C.F.R. § 1630.2(h) (definition of mental impairment). Fuoco further contends that these impairments substantially limited her ability to perform the major life activities of learning how to cope with new job functions, working, and cognitive function. *Pl.'s Br.* at 3, 11. Learning, working, and thinking are specifically listed in the statute as major life activities. 42 U.S.C. § 12102(2)(A).

Nevertheless, the issue is whether Fuoco has shown that she actually suffered from depression and ADD and whether those impairments substantially limited her ability to work, learn, and think. In order for me to perform the necessary individualized assessment, I must examine the nature and severity of Fuoco's impairments, whether it be through evidence of diagnosis, treatment, or history experiencing symptoms, and how they impacted and limited her ability to perform her identified major life activities.

### a. *Depression*

Despite the arguments in plaintiff's response to the motion for summary judgment, Fuoco's counsel conceded at oral argument that depression had nothing to do with the problems she experienced preceding her termination in 2010. This concession is justified based on the

evidence of this case.  Fuoco offers no documentation of a depression diagnosis.  Moreover, nothing in the record indicates Fuoco experienced symptoms of depression, sought treatment for it, mentioned it to anyone at Lehigh, or herself believed she suffered from depression after 2006. Furthermore, Fuoco points to no evidence in the record, and in fact makes no argument, as to how depression had any impact on a major life activity.

I find that Fuoco has not pointed to sufficient evidence creating a triable issue of fact as to whether she suffered from depression during the relevant time period or whether her depression substantially limited any major life activity.  Thus, Fuoco was not disabled within the meaning of the statute due to her depression.  Moreover, because Fuoco conceded that depression was not a factor near the time of her termination, I will limit the remainder of my discussion to ADD.

### b.  *ADD*

Fuoco asserts that in the summer of 2010 something was wrong with her and she underwent several tests, but did not learn the results, including a diagnosis for ADD, severe anemia, and memory loss, until after she was fired.  *See Fuoco Dep.* at 65-66.  Since Fuoco did not provide any documentation of these diagnoses, there is no way to know if they were accompanied by treatment-recommendations for ADD – and if they were, whether or not she acted upon them and whether or not they were effective, nor did she testify about these matters.[13] What we do know is that she reported nothing about them to Lehigh.

Dr. Medlar's April 2012 report, created some 18 months after her termination, concluded she *then* met the OVR criteria for ADHD based on the "reported history, diagnostic interview, and assessment results."  *See Def.'s Br.*, Exh. F.  That "reported history" was that Fuoco told him

---

[13] Fuoco testified only that after her diagnosis in 2010, she "started taking vitamins, started doing work in the book [Alcoholics Anonymous manual], started going to a psychiatrist."  *Fuoco Dep.* at 107-08.

she had been "previously diagnosed with AD/HD in 2010." *Id.* Dr. Medlar did not say he reviewed any documentation of that diagnosis or that any was made available to him. Moreover, meeting these criteria is not the same as a diagnosis from a treating or examining physician. As indicated in the report, Dr. Medlar was not one of her healthcare providers. Thus, Dr. Medlar's report is not evidence that she was diagnosed with ADD in 2012 or 2010, nor is it evidence that she met the OVR criteria in 2010.

However, accepting that Fuoco was diagnosed as having ADD in 2010,[14] I must also see whether she pointed to evidence that her ADD substantially limited – as opposed to slightly or moderately limited – her ability to think, learn, concentrate and work. Based on the record before me, there is no evidence that any or all of Fuoco's many problems were attributable to ADD.

Fuoco's own testimony is contradictory as to when she started to experience conditions that she now believes came from ADD. On the one hand, Fuoco testified that, although she did not know she had ADD, she always struggled with forgetting and making mistakes and paying attention to detail. *Fuoco Dep.* at 31-32. She testified that she "knew [she] was ADD all [her] life based on [her] life and [her] ability to organize and attend and remember and concentrate." *Id.* at 50. Fuoco also testified that she had problems with "communication," so that sometime while working in the Office of Admissions, which was from 2002 to 2007, she began asking for everything to be put in writing rather than people giving her "oral directives." *Id.* at 81-84.

If Fuoco contends that she has always had ADD, then her claim of having an impairment that substantially limited the major life activities of working, thinking, and learning, is defeated

---

[14] My acceptance of this premise is based on Fuoco's testimony alone, and I am doing so despite the fact that she did not raise ADD in her complaint or her amended complaint, which was filed on March 26, 2012. Instead, she mentioned ADD in her response to Lehigh's motion for summary judgment which was filed *after* Dr. Medlar's April 2012 report.

as she clearly managed to cope with the undiagnosed ADD all her life without considerable difficulty – that is, she managed to work for Lehigh for nearly 13 years (including almost five years after her 2005 discipline) and to hold down prior jobs.  In addition, she took classes at DeSales University towards obtaining a college degree.  *See id.* at 8-16; *Def.'s Br.*, Exh. F.  In short, despite her problems, Fuoco was able to perform the duties of her employment.

On the other hand, Fuoco testified that she was not diagnosed with ADD until September 2010, and that she only became "really concerned" that "something was going on" in the summer of 2010, when she started to make mistakes at work.  *See Fuoco Dep.* at 49, 52, 93.  Fuoco stated that she was unsure if she was affected by her "disability or menopause" and by disability she meant, "untreated alcoholism and my ADD."  *Id.* at 49-50.  However, she does not establish how those mistakes were linked to her ADD and merely making mistakes at work is not sufficient to establish a causal connection to a potential disability.

Even if she did not have a diagnosis, or a name for the problem she was experiencing at the time, Fuoco must point to evidence as to why her ability to think, learn, and do her job were impaired or made more difficult, or specifically in the months prior to her termination, how things had gotten significantly worse or what occurred to exacerbate her condition.[15]  In support thereof, Fuoco testified only that in the summer of 2010, she was given the additional responsibility of supporting a new staff member, her stress level increased, her mistakes increased, and everything became "more overwhelming," explaining that she is "easily overwhelmed with too much information or interaction with trying to . . . maintain and stay on

---

[15] The one isolated instance Fuoco testified about concerning her ability to concentrate or multitask during her job occurred five years prior to her termination.  Fuoco testified that in September 2005, she asked her supervisor, Lisa Dubreuil, to relieve her of the duty of answering phones "[b]ecause of the level of distraction it was going to cause me from the level of work I had to do."  *Fuoco Dep.* at 27-28.  Despite this being a general complaint – one that could be linked to several different causes, including simply being overwhelmed with new duties – it was a limited occasion, far removed from the time at issue, and not linked to a disability in Fuoco's own view and certainly not to the knowledge of her supervisors.

task and agenda-wise." *Id.* at 113, 119. She further testified that while she was generally able to "manage" her unknown disability with "little difficulty" it was "when the height of the calendar came, that is when my difficulties arose." *Id.* at 119.

Fuoco offers nothing other than her speculative and subjective belief that her problems were the result of her ADD. This is not enough to establish that her ability to work, think, or learn were impaired by ADD, as opposed to any other reason. Moreover, a mere preference for written rather than oral directions, general forgetfulness, and a proclivity for getting overwhelmed with too much information or when schedules become busy are insufficient to establish that she suffered from ADD to the extent that the disorder *substantially* limited her ability to think, learn, or work. Indeed, I would think most people prefer directions in writing and get overwhelmed with an abundance of information. *See Warshaw v. Concentra Health Servs.*, 719 F. Supp. 2d 484, 494-95 (E.D. Pa. 2010) (noting that "occasional forgetfulness is not an unusually restrictive limitation on cognitive function . . . nor is remembering particular facts later than one wishes").

Thus, even bearing in mind that the amended version of the ADA "requires a less searching analysis of whether a plaintiff is substantially limited," I find that Fuoco has not provided sufficient evidence to raise a genuine issue of fact as to whether she was disabled due to her ADD. *See Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 620 (E.D. Pa. 2012).

### 2.  Regarded as Having an Impairment

Alternatively, Fuoco contends that she was "regarded as being disabled." *Pl.'s Br.* at 15. However, Fuoco offers nothing other than bare, unsupported assertions in her brief that she was "viewed as being disabled."[16] *Id.* Not only does Fuoco fail to explain which disability she was

---

[16] Fuoco testified that she was perceived as "unintelligent or just incapable," she had "an inferiority complex", and she "was different." *Fuoco Dep.* at 85, 97, 178. Fuocco explained that she was different from her

regarded as having, and by whom, but she offers no evidence that Lehigh perceived her as having ADD or depression at or around the time it terminated her employment.  Moreover, there is nothing in the record to suggest that Lehigh's decision to end her employment was based on its perception that Fuoco had ADD or depression.  *See* 42 U.S.C. § 12102(3)(A) (an individual meets the "regarded as" requirement if she establishes that "she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity").

Because I find that no reasonable fact-finder could conclude that Fuoco was actually disabled or regarded as disabled within the meaning of the ADA, summary judgment in favor of Lehigh was required on this finding alone.  Nevertheless, I will analyze the remainder of Fuoco's discrimination claims.

### B.  Discrimination

Even if Fuoco had sufficiently established that she had a disability under the ADA, and assuming she was qualified for the job she held prior to her termination,[17] I find as a matter of law that she fails to make out a claim of discrimination based on either Lehigh's decision to

---

co-workers: "I was not your college educated preppy person that most staff members were like.  I rode my motorcycle to work.  I talked bravely about spiritual things and dysfunction in my life."  *Id.* at 178.  No other evidence concerning how Lehigh regarded Fuoco as an employee was offered.

[17] The Third Circuit has held that a plaintiff is a "qualified individual" if he or she can "'satisfy the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.' and, the plaintiff must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodations.'"  *Taylor*, 184 F.3d at 311 (internal quotations and citations omitted); *see also* 42 U.S.C. § 12111(8).  Given that Fuoco worked for Lehigh for 13 years and held the position she was in at the time she was terminated for almost 3 years, there is no serious dispute that she satisfied the prerequisites for the job.  While not exploring the matter, I note that an indefinite absence from work – which is the accommodation Fuoco suggests was reasonable – begs the question as to how she could have performed the duties of her job without being there.  Nevertheless, as Fuoco ultimately fails to meet her burden as to other elements of her claim, I will assume for purposes of deciding this motion that she was able to perform the essential functions of her job with or without some reasonable accommodation.

terminate her employment or its failure to provide her with a reasonable accommodation.  Thus, summary judgment in favor of Lehigh was required.

### 1.  Disparate treatment

Fuoco does not argue that there is direct evidence of discrimination; therefore she may present circumstantial evidence of unlawful employment practices, and that evidence will be considered under the familiar three-stage *McDonnell Douglas* burden-shifting analysis.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997) (*McDonnell Douglas* burden-shifting framework applies to ADA disparate treatment claim).

To survive a motion for summary judgment, Fuoco must first come forward with evidence to establish a *prima facie* case of discrimination.  As stated above, she would need to show that she was a disabled person within the meaning of the ADA, she was qualified, and she suffered an adverse employment decision as a result of discrimination.  *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).  If Fuoco establishes a *prima facie* case, the burden of production then shifts to her former employer, Lehigh, to articulate some legitimate, nondiscriminatory reason for her rejection.  If Lehigh does so, the burden of production shifts back to Fuoco for the third stage of the *McDonnell Douglas* analysis, where she must point to sufficient evidence from which a fact-finder could reasonably conclude that the legitimate reasons offered by Lehigh were not its true reasons, but were a pretext for discrimination.  *See Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  At all times, the burden of persuasion rests with Fuoco.

Turning to Fuoco's *prima facie* case, and accepting for purposes of this discussion that she was disabled and otherwise qualified, I find that Fuoco fails to raise even an inference that her disability was factored into the adverse employment decision at issue, her termination.

Fuoco acknowledges that the ADD diagnosis did not come to her until after she was terminated and therefore no one could have known about this alleged disability, yet alone considered it as part of the decision to fire her. Nevertheless, Fuoco claims that she informed Lehigh of her "illness" and was then terminated almost immediately thereafter. *Pl.'s Br.* at 13. However, to find causation based on temporal proximity using this logic would mean that Lehigh had to infer a mental impairment, rising to the level of a covered disability and differing from any of her previous health issues experienced over her lengthy employment, based on her statements that something was wrong with her or that she was not sure if she was experiencing "menopause or a disability," and then had to factor that into its decision to terminate her employment. No reasonable fact-finder could reach this conclusion. As Fuoco does not point to anything else suggesting that Lehigh considered her impairment as part of its decision, she cannot satisfy this element of a *prima facie* case.

Even if Fuoco could establish a *prima facie* case, she has failed to refute any of Lehigh's proffered legitimate reasons for her termination or otherwise shown that those reasons were a pretext for discrimination. Lehigh has explained that it lost confidence in Fuoco's ability to do her job correctly, and cites to specific mistakes it alleges she made in August and September 2010, including the mistake with respect to Heritage Days on September 22, 2010, that Lehigh considered significant and one that directly contributed to its decision to terminate her.

Not only does Fuoco have no response as to these reasons for her termination, or even attempt to discredit them, she admits she made the mistakes cited by Lehigh. Instead, Fuoco

tries to prove pretext by arguing that she had satisfactory performance "prior to her notifying the Defendant of her health issues" and that "there is very little evidence of progressive steps of discipline in this case." *Pl.'s Br.* at 14.  However, the record demonstrates that Fuoco's contention is simply not true, as she had previously been reprimanded by her supervisor for poor work performance, placed on probation for a period of time in late 2005/early 2006, received a performance evaluation reflecting "improvement needed," and finally, in September 2010, placed on a PIP after the Dorney Park incident and other mistakes Lehigh contends she made. Then, according to Lehigh, it finally made the decision to fire Fuoco after she failed to order necessary items for Heritage Days – a mistake she made while still on the PIP and one considered significant because it was a key-job responsibility.

Thus, Fuoco has pointed to no evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Lehigh's proffered reasons such that a fact-finder could find them "unworthy of credence." *Fuentes*, 32 F.3d at 765.  Fuoco simply has not come forward with any evidence from which a fact-finder could reasonably either disbelieve Lehigh's articulated reasons, or believe that discrimination on account of disability was more likely than not a motivating or determinative cause of Lehigh's employment decision. As Fuoco fails to meet her burden of demonstrating pretext, I granted summary judgment in favor of Lehigh on plaintiff's disparate treatment claim.

### 2.  Failure to Accommodate

As stated above, an employer can be liable for discrimination under the ADA if the employer does not make "reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can

demonstrate that the accommodation would impose an undue hardship[18] on the operation of [its]

business." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). The statute contains a non-exhaustive

list of what are considered reasonable accommodations, including, *inter alia*, job restructuring,

part-time or modified work schedules, and reassignment to a vacant position. *Id.* § 12111(9).

"Consistent with the duty to reasonably accommodate, an employer must 'engage the employee

in the interactive process of finding accommodations.'" *Kiniropoulos v. Northampton Cnty.*

*Child Welfare Serv.*, 917 F. Supp. 2d 377, 384 (E.D. Pa. 2013).

    Once a qualified individual with a disability requests reasonable accommodation, that

notice would trigger the employer's duty to engage in an "interactive process" with the

individual to determine what accommodations would overcome his or her limitations. *See*

*Taylor*, 184 F.3d at 311-313, 315.[19] Because the statute explicitly states that the employer may

be held liable for failure to make accommodations for a *known* disability, it is clear that the

employer "must know of both the disability and the employee's desire for accommodations for

that disability." *Id.* at 313 (noting that "[e]mployers cannot assume employees are disabled and

need accommodations").

    The first issue then is whether Lehigh had notice of Fuoco's disability. Lehigh argues

that it was never put on "actual or constructive notice" of Fuoco's ADD and it was only notified

of Fuoco's possible cognitive disorder after her termination. *Def.'s Br.* at 15. Lehigh claims that

---

    [18] "Undue hardship" is defined under the statute as "an action requiring significant difficulty or expense" when considered in light of certain factors, which are set forth in a non-exhaustive list and include cost of the accommodation, and the financial resources, impact, size and type of the business. 42 U.S.C. § 12111(10).

    [19] The Third Circuit has instructed that an employee claiming that her employer was responsible for the breakdown in the interactive process must show that (1) the employer knew about the disability; (2) employee requested reasonable accommodation for her disability; (3) employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 330 (3d Cir. 2003). Because I find that Fuoco does not point to sufficient evidence to satisfy the first two elements, there is no need to address the other elements.

it first received "medical notice of the *possibility* that she might have a cognitive disorder on October 7, 2010" when Fuoco submitted a letter to Human Resources from Dr. Marie Buschi indicating Fuoco was undergoing cognitive testing and should be excused from work. *See id.* at 13; *Zavalydriga Aff.* ¶ 33.

Fuoco, on the other hand, argues that Lehigh had knowledge of Fuoco's "various health problems." *Pl.'s Br.* at 21. Fuoco points to several documents in the record to support her claim that Lehigh knew of her medical issues. However, the issue is not whether Lehigh was aware that Fuoco, or her family members for that matter, had a multitude of health problems varying in type and severity, and spanning the course of many years.[20] The question is whether Lehigh was on notice of a particular disability, here ADD, which entitled her to protection under the ADA, and none of the documents Fuoco has submitted demonstrate that Lehigh had notice of her ADD or a disorder that was later identified as ADD.

Fuoco refers to the April 2012 report by Dr. Medlar and argues that the report's reference to her diagnosis with ADD in 2010 somehow suggests that Lehigh knew or should have known about Fuoco's ADD at that time. However, as Fuoco has acknowledged, that diagnosis, even if she learned of it in 2010, was *after* her employment with Lehigh ended. With respect to the same report, Fuoco also argues that Dr. Medlar's reference to her struggle with mental health issues for "most of her life" means that Lehigh must have known of these same issues because Fuoco filled out a short-term disability benefits form in April 2009 that authorized Lehigh to

---

[20] For instance, Fuoco cites to documents indicating she went out on short-term disability in September 2009. However, there is no evidence that that leave had anything to do with ADD. One of those documents, which was signed in September 2009, indicates a return date of July for part-time and August for full-time, but does not include the reason for the short-term disability, yet it corresponds with what other parts of the record have indicated was Fuoco's leave for her back surgery. *See Pl.'s Br.*, Doc. LU 000255. Other documents fail to identify a reason for Fuoco's absence and Fuoco has not tied them to a particular reason, and therefore they cannot be evidence of Lehigh's knowledge of her ADD or ADD-like symptoms. *See, e.g.*, *id.*, Doc. LU 000256. Finally, Fuoco cites to documents that clearly relate to medical issues or appointments that have nothing to do with her possible ADD, and several of them refer to appointments that were not even for her. *See, e.g.*, LU 000263 (noting her difficulty with her eyesight); LU 000266 (referring to her son's appointment with an oral surgeon).

24

have access to all of plaintiff's medical records. Fuoco reasons that, "the same evidence that led Dr. Medlar to refer to Plaintiff's lifelong struggle with mental health problems was made readily available to Lehigh University by virtue of that April 10, 2009 short-term disability form." *Pl.'s Br.* at 23. A closer look at the April 10, 2009 disability form, however, indicates that Fuoco authorized the release of records to Lehigh as needed to review her application for disability *to recover from her back surgery. See id.*, Doc. 23-8. Fuoco's argument fails for obvious reasons as it is based entirely on speculation as to whether any records pertaining to her mental health existed and, if they did exist, whether they were made available for Lehigh's review. A finder of fact in this case would not be able to determine if Fuoco's medical records support her claims as she has not produced them.

Ultimately, there is only Fuoco's claim that she told her supervisor, Jame'l Hodges, about her ADD. *Pl.'s Br.* at 22; *Pl.'s Facts* ¶ 20. Yet, as I have repeatedly noted, Fuoco was not made aware of her diagnosis with ADD until after she was terminated, thus precluding her claim that she informed Hodges of that diagnosis. Thus, the question is whether Lehigh should have known before her termination that Fuoco was suffering from ADD, a disability that was not identified as ADD until after her termination.

Fuoco testified that in the summer of 2010, when she contends her condition deteriorated and she made errors at work, she informed Alison Gelati that something was wrong, or that she "might have a medical condition" and was not sure whether it was her "age or a disability" but she was going to try and find out what it was. *Fuoco Dep.* at 95. Fuoco testified that she told Hodges, her immediate supervisor, that she was going to "make some doctor appointments because I think I got some disability or menopause going on that is affecting my capabilities." *Id.* at 132. She then told Hodges she was getting tests done. *Id.* at 132-33. Even if her claims

25

are fully credited, this is simply not sufficient to have put Lehigh on notice of a possible disability or what it was.  What she told her supervisors in combination with the other information Lehigh knew at the time – namely that Fuoco had many absences due to various types of appointments and medical issues, in addition to Fuoco having made some mistakes at work – is not enough for a reasonable fact-finder to conclude that Lehigh knew or should have known Fuoco had ADD.

Even if Fuoco did put Lehigh on notice of her disability, she would also have the burden of demonstrating that she requested accommodation for her disability.  "[W]hile the notice does not have to be in writing, be made by the employee, or formally invoke the magic words, 'reasonable accommodation,' the notice nonetheless must make clear that the employee wants assistance for his or her disability."  *Taylor*, 184 F.3d at 313.  Notably, the interactive process can be triggered with the request for a more general accommodation or need for assistance to overcome a limitation – and it is not negated by a request for an accommodation that is ultimately not feasible.  *See id.* at 315-17.

"What information the employee's initial notice must include depends on what the employer knows."  *Id.* at 313.  By way of illustration, the *Taylor* Court discussed a case where the employee mentioned to his employer that he was diagnosed with bipolar disorder, but did not offer further information about his disorder and "could not confirm that he ever explicitly asked for an accommodation or help of any sort."  *Id.*  The Court opined, "[u]nder these circumstances, the employee has not given sufficient notice to trigger the employer's duty to engage in the interactive process."  *Id.*  The Court then contrasted that case with the facts before it where the employee became psychotic at work, the employer knew she was hospitalized immediately after, the employer had been contacted by the hospital and knew how to get more information from the

employee or her physician if needed.  The Court stated that it was not essential that the employer

knew the specific name of the employee's condition, as it was clear that the employer knew the

individual "exhibited serious psychiatric problems and those problems were severe enough" to

require hospitalization and continuing treatment.  *Id.* at 314.

Fuoco has not pointed to evidence from which a reasonable fact-finder could conclude

that Lehigh knew that she was disabled and that she requested accommodation from Lehigh, and

therefore, the interactive process was triggered.  Fuoco's counsel conceded at oral argument that

during her 13 years at Lehigh there was never a request Fuoco made that was refused by

Lehigh.[21]  Even though Fuoco argues in her brief that a short leave of absence would have been a

reasonable accommodation,[22] she never asked for a leave of absence, nor did she request to take

leave under the FMLA or short-term disability, despite her experience having taken such leave in

the past.  Fuoco only mentioned "medical leave" when she emailed Human Resources stating she

was on medical leave and later submitting a doctor's letter in October 2010 – after she was

terminated.  *See Fuoco Dep.* at 160-61; *Pl.'s Facts* ¶ 43-44.

Instead, Fuoco's position is that Lehigh should have known she needed a reasonable

accommodation and should have engaged her in a process of determining what that

accommodation needed to be, despite the fact that Fuoco did not request any specific

---

[21] The only specific requests Fuoco made that are apparent from the record were made while she was in the Office of Admissions (2002-2007) and are therefore far removed temporally from the time she claims she notified her employer of her disability and she should have been given reasonable accommodation.  First, Fuoco requested to be taken off of phone duty because it distracted her from her other work.  Second, Fuoco testified that she requested that her supervisors communicate with her in writing rather than orally, which Fuoco concedes was done when feasible.  *Pl.'s Facts* ¶ 28.  As to each of these requests, Fuoco does not offer any evidence that Lehigh was on notice at that time of her disability, and such generic requests could not have reasonably signaled to Lehigh that she was suffering from a medical problem.

[22] Fuoco does not explain how a "relatively brief" absence would have cured her disorder or resolved the problems she was experiencing, nor does she say how long this absence should have been.

accommodation, nor does she claim that she requested more general help with her disability.[23]

At most, Fuoco told her supervisor that she was going to make some medical appointments, including having some tests done, and that she was not sure whether it was menopause or some unknown disability that was affecting her.  Fuoco does not claim that she requested a leave of absence to attend the appointments or have the tests done.  Moreover, she does not point to evidence that she explained what was causing her to have difficulty at work or that she notified anyone that she was unable to perform certain functions without some kind of assistance.

No reasonable fact-finder could conclude that Fuoco's vague statements about what was wrong with her and her plan to make doctors' appointments and undergo some testing, even in combination with her history of missed work and medical issues,[24] should have signaled to Lehigh that Fuoco was in need of a leave of absence or some other accommodation for her disability.  The interactive process cannot be triggered, and the onus put on the employer, when the employee herself did not know she needed the accommodation and did not ask for it.  Lehigh cannot be expected to define the help an employee needs when it could not reasonably have known she needed help at all.

In sum, under these circumstances Lehigh cannot be held liable for failure to have perceived there was a disability and from that perception, perceived that a reasonable accommodation was required.  As Fuoco did not provide adequate notice to Lehigh as to her

---

[23] In her brief Fuoco refers to a document, Bates number LU 000244, which she labels a "scolding memorandum warning [Fuoco] about the excessive use of sick days."  *Pl.'s Br.* at 20-21.  Fuoco argues that Lehigh provided Fuoco with this document "instead of attempting to engage in an interactive process."  *Id.* at 20.  However this document has no evidentiary value as there is no evidence of who sent the document, to whom it was sent, when it was sent, and plaintiff's own brief claims that it is a "draft" of a document that Human Recourses "'thinks' is similar to other documents sent to Plaintiff previously."  *Id.*

[24] In fact, this history of making doctors' appointments, taking approved leave including vacation, sick time, FMLA or short-term disability, actually goes against plaintiff's favor.  As her history has shown, she managed to do her job while visiting doctors for various ailments throughout her entire employment and Lehigh had always accommodated her needs without adverse action.  Lehigh could not be expected to know that this time, with this medical problem, she needed reasonable accommodation.

disability or her desire for accommodation, the interactive process was not triggered and Lehigh was entitled to summary judgment on Fuoco's failure to accommodate claim.

**IV.**   <u>**CONCLUSION**</u>

For the above stated reasons, summary judgment in favor of Lehigh was granted as to all of Fuoco's claims.